IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALDINE BURTON, et al., | No. C 07-00702 SI |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR REMAND AND DENYING MOTION TO STAY** |
| v. | |
| A W CHESTERTON CO, et al., | |
| Defendants. | |

On May 4, 2007, the Court heard argument on plaintiffs' motion for remand, and defendant McDonnell Douglas Corporation's motion for a temporary stay. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court GRANTS plaintiffs' motion for remand, and DENIES AS MOOT the motion for a temporary stay.

**BACKGROUND**

On October 21, 2004, Harold Burton and his wife Geraldine Burton filed a complaint in San Francisco Superior Court, alleging that numerous defendants were responsible for exposing Mr. Burton to asbestos, which caused Mr. Burton to contract mesothelioma, a cancer of the lung caused by asbestos. Plaintiffs identified five time periods during which Mr. Burton was allegedly exposed to asbestos. *See* Kaiser Decl., Ex. A. The first period, at issue here, was his employment with the United States Air Force, between September 1942 and October 1945. *See id.*

On November 9, 2004, pursuant to the San Francisco Superior Court Asbestos General Orders, plaintiffs served responses to standard asbestos interrogatories. Those responses included more detailed information about Mr. Burton's exposure during his Air Force service, stating in pertinent part:

> Plaintiff spent about six months at the McDonnell Douglas aircraft mechanical school in Long Beach, California, where he was trained to work on engines and brakes on B17 aircraft. He cut gaskets, worked with fuselage insulation, and assisted with brakes. Plaintiff was then transferred to Peyote, Texas, where he worked on aircraft engines and brakes. Plaintiff recalls dismantling Pratt Whitney and Wright Cyclone engines. Plaintiff went to Gunnery School in Wendover, Utah, and was then transferred back to Peyote, Texas, where he flew planes. Plaintiff then flew missions in Germany with the 100th bomb group, squadron 349.

Kaiser Decl., Ex. E ¶ 9.

> **Employer's Name & Address: U.S. Army Air Force**
> Job Title: T/Sgt; mechanic
> Date Started: September 1942
> Date Ended: October 1945
> Description of job duties: Boeing B17 Mechanic; cut gaskets, worked with fuselage insulation, and assisted with brakes. Dismantled Pratt Whitney and Wright Cyclone Engines; attended Gunnery School; flew missions in Germany.
> Job Sites: McDonnell Douglas aircraft mechanical school in Long Beach, California; Army Air Force base in Peyote, Texas; Gunnery School, Wendover, Utah; Germany.
> Estimate of total time at those sites: 3 years
> Exposed to asbestos at this job: Plaintiff contends that he was exposed to asbestos at these locations; investigation and discovery are continuing

*Id.* ¶ 26.

Mr. Burton died on December 31, 2004. His heirs subsequently filed this lawsuit, on April 8, 2005, in San Francisco Superior Court, naming approximately 35 separate defendants. *See id.*, Ex. B. This lawsuit identified the same five general time frames of asbestos exposure, and plaintiffs filed identical responses to the standard asbestos interrogatories, as described above. *See id.*, Exs. B & C.

On March 17, 2006, plaintiffs served the second set of standard discovery responses required by the General Orders, and stated the following with respect to his time in the Air Force:

> Decedent was occupationally exposed to airborne asbestos fibers throughout his working life. He was exposed to asbestos containing materials as a B17 aircraft mechanic in the U.S. Air Force during WWII. He cut gaskets, worked with fuselage insulation, assisted with brakes, and dismantled Pratt Whitney and Wright Cyclone engines. Decedent attended Gunnery School in Wendover, Utah, attended McDonnell Douglas aircraft mechanical school in Long Beach, California, and flew combat missions in Germany. Decedent was also exposed to asbestos containing material on ships and shipyards during the Korean War when he served in the National Guard Armory.

Kaiser Decl., Ex. D at 2.

> **Employer's Name & Address: U.S. Army Air Force**
> Job Title: T/Sgt; mechanic
> Date Started: September 1942

2

Date Ended: October 1945
Description of job duties: Plaintiff was a Boeing B17 Mechanic. He cut gaskets, worked with fuselage insulation, and with an asbestos cloth material used on pipes in the wings that was manufactured by U.S. Rubber (nka Uniroyal). He dismantled Pratt Whitney and Wright Cyclone engines including gaskets and firewalls. He cut sheet gasket material and worked with ring and composition gaskets. He attended Gunnery School and flew missions in Germany for the 100th bomb group in 349 squadron. He was transported from Europe to New York on the *New Amsterdam*, a Dutch liner.
Job Sites: McDonnell Douglas aircraft mechanical school in Long Beach, California; Army Air Force base in Peyote, Texas; Gunnery School, Wendover, Utah; Germany.
Estimate of total time at those sites: 3 years
A/C materials: Ajcraft [sic] engines, gaskets, firewall, board, brake components; investigation and discovery are continuing.

*Id.* at 5.

On November 8, 2006, defendants Boeing Company and McDonnell Douglas Corporation ("MDC") filed separate motions for summary judgment in state court. On January 16, 2007, plaintiffs filed their opposition to the summary judgment motions, and included the declaration of Jamer R. Tukesbrey, who served with Mr. Burton in the Air Force. Mr. Tekesbrey stated in his declaration that he and Mr. Burton serviced B-17s, as well as DC-3s, DB-7s, and B-25s. *See* Tekesbrey Decl. (MDC Ex. 51). Specifically, Mr. Tekesbrey stated that, at an aircraft engine and mechanic school in Sheppard Field, Texas,

Harold Burton and I worked in close proximity to others who were performing brake replacement and other work on various airplanes, including but not limited to Douglas DC-3s, Douglas DB-7s (A-20 Havoc), and B-25s. When performing brake repairs on these aircraft, mechanics routinely used compressed air to blow dust out of the brake assemblies, which resulted in a lot of airborne dust in the hangar which we breathed.

*Id.* ¶ 10.

On February 2, 2007, before the summary judgment motions were heard, and 24 days before trial was set to begin, defendants Boeing, MDC, and United Technologies Corporation (UTC), each filed notices of removal to this Court. Plaintiffs now move to remand this case to state court.[1]

## LEGAL STANDARD

A motion to remand is the proper procedure for challenging an opposing party's removal.

---

[1]Defendant MDC also moves to temporarily stay the action pending a decision by the Judicial Panel on Multidistrict Litigation on whether to transfer this case to the asbestos Multidistrict Litigation in Pennsylvania. In light of the following, the motion to stay is moot.

3

Remand to state court may be ordered either for lack of subject matter jurisdiction or for any defect in removal procedure. *See* 28 U.S.C. § 1447(c). The court may remand *sua sponte* or upon the motion of a party. A defendant who invokes the federal court's removal jurisdiction has the burden of establishing federal jurisdiction. *See Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988) (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)).

**DISCUSSION**

Plaintiffs argue that defendants' removal was both untimely and substantively deficient.

"After a defendant learns that an action is removable, he [or she] has thirty days to remove the case to federal court." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2005) (citing 28 U.S.C. § 1446(b)). Unless the initial "'pleading affirmatively reveals on its face' the facts necessary for federal court jurisdiction," *id.* (quoting case), "the thirty-day clock doesn't begin ticking until a defendant receives 'a copy of an amended pleading, motion, order or other paper' from which it can determine that the case is removable," *id.* (quoting 28 U.S.C. § 1446(b)).

In addition to the more common federal question and diversity grounds for removal, pursuant to 28 U.S.C. § 1442(a), "[f]ederal officers, and their agents, may remove cases based on acts performed under color of their federal office if they assert a colorable federal defense." *Id.* at 1251 (citing 28 U.S.C. § 1442(a); *Mesa v. California*, 489 U.S. 121, 129, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)). "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims, and (c) it can assert a 'colorable federal defense.'" *Id.* (citing *Jefferson County v. Acker*, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999); *Mesa*, 489 U.S. at 124-25, 131-35).

Unlike the general removal statutes, which "are to be strictly construed, and any doubts as to the right of removal must be resolved in favor of remanding to state court," *id.* at 1252 (quoting case), "the Supreme Court has mandated a generous interpretation of the federal officer removal statute," *id.* (citing *Colorado v. Symes*, 286 U.S. 510, 517, 52 S. Ct. 635, 76 L. Ed. 1253 (1932)). There is, according to the Ninth Circuit, "a clear command from both Congress and the Supreme Court that when federal

4

officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." *Id.* Also unlike the general removal statues, under section 1442, not all defendants need concede to removal. *See Eli Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981) ("Thus, § 1442 represents an exception to the general rule (under §§ 1441 and 1446) that all defendants must join in the removal petition."). One defendant in a multi-defendant case can unilaterally remove the entire case to federal court, if it meets the requirements of section 1442.

In *Durham*, which also dealt with asbestos exposure during Air Force service, the plaintiff, Durham, "filed his complaint against Lockheed Martin and sixty other defendants on August 7, 2003, in California Superior Court. In his complaint, Durham listed the Air Force facilities where he worked, but didn't allege which Lockheed products exposed him to asbestos." *Durham*, 445 F.3d at 1249. Ten days after plaintiff served Lockheed with the complaint, "Lockheed received plaintiff's answers to interrogatories. These interrogatories for the first time disclosed the specifics of Durham's claim--that he was exposed to asbestos while working on the SR-71 Blackbird and the C-141 Starlifter aircraft on military bases where Lockheed was a contractor." *Id.* "Lockheed didn't file a notice of removal until September 24--more than thirty days after it had been served with the complaint, but less than thirty days after it had received Durham's interrogatory responses." *Id.* In fact, notice of removal was filed 48 days after the complaint was filed.

On appeal, the Ninth Circuit found that the case was not "removable" for purposes of starting the thirty-day clock "[u]ntil Durham revealed which aircraft he had worked on during his Air Force career." *Id.* at 1251. Until that point,

> Lockheed couldn't assert either that its actions were taken pursuant to a federal officer's directions, or that it had a colorable federal defense. Lockheed, like other federal military contractors, performs some activities on military bases that are protected by federal contractor immunity, and others that are not. There wasn't enough information in Durham's complaint for Lockheed to discern whether its allegedly wrongful conduct was protected by federal contractor immunity. Had it removed upon filing of the complaint, it may well have subjected itself to fees and costs, and potentially Rule 11 sanctions, for filing a baseless notice of removal. . . . [W]e no longer require defendants to take this blind leap--we don't charge defendants with notice of removability until they've received a paper that gives them enough information to remove.

*Id.* The Ninth Circuit therefore concluded that Lockheed's notice of removal was timely, as Lockheed filed it within thirty days after the interrogatory responses that identified the specific aircraft models that

5

the plaintiff had worked on. *Id.* at 1254.

Defendants argue that *Durham* compels this Court to find that their removal of this case – more than two years after Mr. Burton first filed his action and almost two years after his heirs filed this one – was timely. As discussed, only one defendant need establish removability to remove the entire case. In this case, three defendants filed notices of removal. The Court therefore must analyze, under *Durham*, the timeliness of all three defendants' removals.

**1.     McDonnell Douglas Corporation (MDC)**

On January 12, 2007, in opposition to motions for summary judgment in the state court action, plaintiffs provided the declaration of Mr. James R. Tekesbrey, a member of Mr. Burton's Air Force Bomb Squadron during WWII. *See* Tekesbrey Decl. (MDC Ex. 51). In his declaration, Mr. Tekesbrey stated that, at an aircraft engine and mechanic school in Sheppard Field, Texas,

> Harold Burton and I worked in close proximity to others who were performing brake replacement and other work on various airplanes, including but not limited to Douglas DC-3s, Douglas DB-7s (A-20 Havoc), and B-25s. When performing brake repairs on these aircraft, mechanics routinely used compressed air to blow dust out of the brake assemblies, which resulted in a lot of airborne dust in the hangar which we breathed.

*Id.* ¶ 10. MDC contends that before receiving this declaration, it did not have sufficient information upon which to base a section 1442 notice of removal. The Court is unconvinced.

Plaintiffs' complaints and interrogatory responses, described above, gave MDC sufficient information to understand which MDC products allegedly exposed Mr. Burton to asbestos. In particular, plaintiffs repeatedly alleged that Mr. Burton was exposed to asbestos while training to be a B-17 mechanic for six months at a McDonnell Douglas aircraft mechanical school. For example, on November 9, 2004, and then again on May 18, 2005, plaintiffs stated: "Plaintiff spent about six months at the McDonnell Douglas aircraft mechanical school in Long Beach, California, where he was trained to work on engines and brakes on B17 aircraft. He cut gaskets, worked with fuselage insulation, and assisted with brakes." Kaiser Decl., Exs. C & E ¶ 9.

MDC argues that this was insufficient because MDC did not build all models of the B-17 used by the Air Force during World War II. *See* MDC Oppo. at 1-4. It defies common sense, however, to interpret plaintiffs' allegations to mean that Mr. Burton worked at the MDC training facility on B-17s

6

made exclusively by companies other than MDC. MDC provides no evidence to suggest that such an interpretation would be reasonable. Paragraph 9 of the first set of standard interrogatory responses thus gave MDC information which was equally specific as, if not more specific than, the information given to MDC in the Tekesbrey declaration, and the information given to Lockheed by the interrogatory responses in *Durham*. *See Durham*, 445 F.3d at 1249. MDC's removal was therefore untimely.

### 2. United Technologies Corporation (UTC)

Pratt & Whitney, an unincorporated division of UTC, manufactured aircraft engines for the United States military throughout World War II. As discussed above, plaintiffs alleged, at various points, that Mr. Burton had worked on Pratt & Whitney engines during his time in the Air Force. Plaintiffs also alleged that he was a B-17 mechanic. According to UTC, Pratt & Whitney engines were not used in B-17 aircraft in the 1940s. UTC therefore contends that plaintiffs' complaint and initial interrogatory responses did not give UTC sufficient information upon which to establish the existence of the second requirement of removability under section 1442 – a causal nexus between UTC's actions, taken pursuant to a federal officer's directions, and plaintiffs' claims.

UTC did not ascertain sufficient information, it argues, until January 26, 2007, when it deposed Mr. Tekesbrey. According to UTC, "Mr. Tekesbrey confirmed that the B-17 was powered [] solely by Wright Cyclone engines, not Pratt & Whitney engines." UTC Oppo. at 3:22-23. He also "testified that he and Decedent worked in the vicinity of others performing engine work on the military equivalent of the DC-3." *Id.* at 3:25-27. Pratt & Whitney manufactured one of the engines, the R-1830, that powered the DC-3. *See* White Decl. ¶ 5. According to UTC, "[t]he United States military exercised immediate supervision over all aspects of Pratt & Whitney's design and manufacture of the R-1830." UTC Oppo. at 4:3-4. Thus, UTC contends, it did not have sufficient information to remove under section 1442 until Mr. Tekesbrey identified Decedent's work near the DC-3, in January 2007.

UTC's argument is unconvincing. Plaintiffs never stated in their earlier interrogatory responses that Mr. Burton worked on Pratt & Whitney engines in B-17 aircraft, or that Mr. Burton only worked on B-17 aircraft. As described above, the complaints and interrogatory responses included the following statements: "Description of job duties: Boeing B17 Mechanic; cut gaskets, worked with fuselage

7

insulation, and assisted with brakes. *Dismantled Pratt Whitney and Wright Cyclone Engines*; attended Gunnery School; flew missions in Germany." Kaiser Decl., Exs. C & E ¶ 26 (emphasis added). "Plaintiff recalls dismantling Pratt Whitney and Wright Cyclone engines" *Id.* ¶ 9.

> Description of job duties: Plaintiff was a Boeing B17 Mechanic. He cut gaskets, worked with fuselage insulation, and with an asbestos cloth material used on pipes in the wings that was manufactured by U.S. Rubber (nka Uniroyal). He dismantled Pratt Whitney and Wright Cyclone engines including gaskets and firewalls. He cut sheet gasket material and worked with ring and composition gaskets. He attended Gunnery School and flew missions in Germany for the 100th bomb group in 349 squadron. He was transported from Europe to New York on the *New Amsterdam*, a Dutch liner.

*Id.*, Ex. D at 5.

The Court agrees with UTC that plaintiffs' responses suggest that Mr. Burton was primarily a B-17 mechanic. The responses, however, also clearly and repeatedly state that Mr. Burton dismantled Pratt & Whitney engines. UTC does not explain why somebody who was trained to work on B-17s could never have worked on a Pratt & Whitney engine, perhaps while being trained to work on another aircraft, or for some other reason. Particularly telling is paragraph nine of set one of the standard interrogatory responses (in both the pre-death and post-death lawsuits), which states that "Plaintiff was then transferred to Peyote, Texas, where he worked on *aircraft* engines and brakes. Plaintiff recalls dismantling Pratt Whitney and Wright Cyclone engines." Kaiser Decl., Exs. C & E ¶ 9 (emphasis added). Neither paragraph nine, nor any other document, suggests that Mr. Burton worked only on B-17s in Peyote. Rather it states that "he worked on aircraft engines and brakes," including "Pratt Whitney" engines. *Id.*

UTC thus knew that it was included in the lawsuit because plaintiffs thought that Mr. Burton had worked on Pratt & Whitney engines during his Air Force service. According to UTC, with respect to Pratt & Whitney engines during WWII, "[t]he military specified precisely what type of engine it wanted, directly oversaw all aspects of engine development and testing, and ultimately approved compliance with such specifications before placing the engines into service." UTC Oppo. at 1:5-8. UTC thus had, from plaintiffs' initial interrogatory responses, sufficient information to determine that it could remove under section 1442. It knew there was a causal nexus between its actions – the manufacture of Pratt & Whitney engines during WWII – taken pursuant to a federal officer's directions, and plaintiffs' claims – that Mr. Burton worked on Pratt & Whitney engines. UTC also knew, early on, that it could assert

8

a colorable federal defense, because by its own account, all Pratt & Whitney engines were manufactured under the close direction of the military. In *Durham*, the plaintiff needed to identify the specific aircraft upon which he had worked because Lockheed "performs some activities on military bases that are protected by federal contractor immunity, and others that are not." *Durham*, 445 F.3d at 1251. Here, UTC asserts that all of its engines produced for the military were produced under close supervision. Thus in contrast to *Durham*, here plaintiffs did not need to identify the particular Pratt & Whitney engine Mr. Burton worked on in order to allow UTC to determine whether it was protected by federal contractor immunity. The Court therefore concludes that UTC's notice of removal was not timely.

### 3. Boeing

Boeing argues that "claims that Decedent was a 'B-17 aircraft mechanic' and purportedly performed certain duties on some aircraft do not establish that he, in fact, worked on the B-17 aircraft." Boeing Oppo. at 7:17-19. Boeing therefore argues that despite plaintiffs' repeated descriptions of Mr. Burton's work as a B-17 mechanic, and more specifically as a "Boeing B-17 mechanic," plaintiffs did not present sufficient information on which to base a section 1442 removal until the Tekesbrey declaration. The Court disagrees. Since 2004, plaintiffs have repeatedly presented Boeing with information identical to that provided by the plaintiff's interrogatories in *Durham* – the model of defendant's military aircraft that allegedly exposed the decedent to asbestos. *See Durham*, 445 F.3d at 1249, 1251. Boeing's recent removal was therefore untimely.

///

9

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS plaintiffs' motion to remand pursuant to 28 U.S.C. § 1447(c), and this action is REMANDED to the San Francisco Superior Court. Defendant MDC's motion to stay this action, pending its transfer to the Multidistrict Litigation No. 875 *In Re Asbestos Product Liability Litigation* proceedings in the Eastern District of Pennsylvania is DENIED as moot. Plaintiffs' request for fees and costs of the removal proceedings is DENIED.

**IT IS SO ORDERED.**

Dated: May 7, 2007

SUSAN ILLSTON
United States District Judge